**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Cecil Arnold ODOM, a/k/a Bud Kelly,**
**Defendant–Appellant.**

**No. 88–5687.**

United States Court of Appeals,
Fourth Circuit.

Argued May 12, 1989.

Decided Oct. 31, 1989.

---

Luther Charles West, Baltimore, Md., for defendant-appellant.

Barbara Slaymaker Sale, Asst. U.S. Atty., Baltimore, Md. (Breckinridge L. Willcox, U.S. Atty., Washington, D.C., on brief), for plaintiff-appellee.

Before MURNAGHAN and CHAPMAN, Circuit Judges, and SMALKIN, United States District Judge for the District of Maryland, sitting by designation.

CHAPMAN, Circuit Judge:

This appeal presents an unusual former jeopardy question. Appellant and a codefendant, Victor Carroll Fincham, were tried for conspiracy to murder a government witness and aiding and abetting in the murder of a government witness. After two days of trial, it became obvious that appellant's attorney had adopted a plan of defense which included doing all in his power to attack codefendant Fincham and to persuade the jury by reference to past wrongful acts that Fincham was the "kingpin" in the killing and that appellant was merely "an underling." During these two days of trial, Fincham's attorney made several motions for a severance claiming that Fincham was being unduly prejudiced by the manner in which appellant's attorney was conducting appellant's defense. On the third day of trial, Judge Motz granted a severance, over appellant's objection. The judge elected to proceed with the trial against Fincham, who was convicted. The trial judge found that because he had granted a severance and not a mistrial, there was no requirement that there be a "manifest necessity" to discontinue the trial as required by *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The trial judge further found "even if manifest necessity is the proper standard in such a case, there was manifest necessity here." We find that on the present facts the trial judge did not abuse his discretion in granting a severance. The trial judge had discretion as to which defendant to sever from the trial, and the judge did not abuse his discretion in severing the appellant rather than the codefendant Fincham. We find no violation of appellant's protection against double jeopardy in requiring him to now stand trial.

I.

For a proper understanding of this appeal, it is necessary to review the prosecutions that have resulted as a consequence of the murder of a federal witness, John Vitkauskas, who was killed June 14, 1987. Vitkauskas was to testify against Dale Joseph Benjamin, Sr. and his son, Dale Joseph Benjamin, Jr. in their trial for the theft of an armored car. An indictment was returned on February 25, 1988 charging Dale Joseph Benjamin, Sr., Victor Carroll Fincham, and Cleveland Everett Miller with conspiracy to murder, tampering with a witness, retaliating against an informant, using a firearm to tamper with a witness, and using a firearm to retaliate against an informant. The present appellant, Cecil Arnold Odom, also known as Bud Kelly, was not indicted in the first action.

Trial on the first indictment began in May 1988. The prosecution contended that

Benjamin and Fincham hired Miller to kill Vitkauskas to prevent him from testifying against Benjamin. During the trial, Benjamin elected to testify in his defense and Fincham then moved for a severance claiming that Benjamin's defense was antagonistic and prejudicial to his own defense. Judge Young conducted an evidentiary hearing on the motion to sever and found that Benjamin's defense "is completely antagonistic to and irreconcilable with Fincham's defense. If the jury believes Benjamin's story, it must convict Fincham, similarly, if the jury believes Fincham's story, to which Benjamin refers in his defense, it must convict Benjamin." The trial judge further found that Benjamin's defense focused on Fincham's drug involvement and claimed that Fincham had Vitkauskas killed to prevent him from telling police about Fincham's drug dealings. The judge found that Benjamin was to testify that, as a result of a phone call he made to Fincham to advise him that Vitkauskas knew of Fincham's cocaine distribution ring, Fincham had Vitkauskas killed and set Benjamin up as "the fall guy." The court found that a severance of Fincham allowed Benjamin to present his complete defense without unfairly prejudicing Fincham's case.

The jury verdict in the first trial acquitted Benjamin and convicted Miller, who then elected to cooperate with the government. Acting upon information supplied by Miller, the grand jury returned a superseding indictment charging Fincham and appellant Odom with conspiracy to murder. Miller's statement was that Odom was fully involved in the planning of the murder and that Odom had ridden with Miller and Vitkauskas when Vitkauskas was taken on his last ride. Miller also stated he was paid $500 of Odom's money and also had a cocaine debt forgiven as payment for killing Vitkauskas.

Following the superseding indictment, Fincham moved for a severance in anticipation of unspecified antagonistic defenses. Judge Motz held a hearing and denied the severance motion, but stated it would be subject to reconsideration as the trial developed. On the opening day of trial the district judge attempted to establish certain ground rules to govern the attorneys during opening statements and examination and cross examination of witnesses. In so doing he was attempting to prevent antagonistic and prejudicial information, such as prior firearm and narcotics dealings, from being brought into evidence by one defendant against the other. Counsel for Odom objected to these ground rules because he wished to present more evidence of Fincham's wrongdoings, and in his opening statement to the jury and in questioning the witnesses he did everything possible to prejudice Fincham in the eyes of the jury. The attorney was admonished on several occasions by the trial judge, but without success. Appellant's attorney refused to follow the ground rules established by the court and proceeded with his attack upon the codefendant Fincham. During the first two days of trial Fincham made unsuccessful motions for a severance, but on the morning of the third day of trial the court found that a severance was necessary to protect Fincham. This presented the question of which defendant should be severed. Fincham asked to be severed, but Odom asked to be retained and that the trial proceed against him. The United States Attorney asked that the case continue against Fincham because Fincham had been severed from the first trial and a second severance of Fincham on a charge as serious as conspiracy to commit murder would give an appearance to the public that Fincham had "beat the system."

The trial judge granted the motion to sever appellant and proceeded with the trial of Fincham.

Shortly thereafter, Odom filed a motion to bar his retrial on double jeopardy grounds and a motion to prevent the government, in the event of a retrial, from using any evidence developed since the time of his previous trial. Both motions were denied and Odom appealed.

## II.

■ Defendants Odom and Fincham were properly charged in the same indictment and scheduled for a joint trial. Fed-

eral Rule of Criminal Procedure 8 provides for joinder of defendants when they are alleged to have participated in the same act or series of acts constituting an offense. However, Federal Rule of Criminal Procedure 14 provides:

**Relief from Prejudicial Joinder**

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

In *United States v. Santoni*, 585 F.2d 667, 673 (4th Cir.1978), we found that when defendants were improperly joined under Rule 8 severance was mandatory, but we stated: "On the other hand, if joinder was proper the trial court was permitted to exercise its discretion in determining whether or not to proceed with a joint trial." In *United States v. Spitler*, 800 F.2d 1267, 1272 (4th Cir.1986), we pointed out that the facts of each case must be examined to determine whether sufficient prejudice exists to require a severance, but we stated: "Application of this standard ... is for the district court in the first instance, and reviewable here only for abuse of discretion." In *Spitler* we also held that antagonistic defenses do not per se require severance, even when the defendants attempt to cast the blame on each other. However, on the present record we are convinced that the trial judge did not abuse his discretion in granting a severance on the third day of trial.

In his order denying appellant's motion to dismiss the present indictment under the Double Jeopardy Clause the judge outlined the history of the prior trial, the return of the superseding indictment, and the events leading up to the granting of the severance as follows:

Prior to trial, Fincham again moved for a severance based upon anticipated antagonistic defenses. This court denied the motion, subject to it being renewed during the course of the trial if it became apparent that Kelly's[1] defense was so antagonistic to Fincham's as to deprive the latter of a fair trial. In denying the motion, the court also established certain ground rules, designed to assure a fair trial for both defendants, concerning the extent to which the Government could present evidence as to drug activities in which it alleged Fincham and Kelly were involved and the extent to which Kelly could present evidence of and refer to drug and other illegal activities in which he alleged that Fincham was involved. After the opening statement made by Luther West, the attorney for Kelly, Fincham renewed his motion for a severance. The court denied the motion at that time and several times thereafter when it was again renewed. However, on the morning of the third day of trial, the Court reconsidered its position and granted Fincham's severance motion. The catalyst for this ruling was an evidentiary question; Kelly wanted to elicit testimony concerning a prior firearm transaction which the Court concluded was admissible as part of Kelly's defense but was not properly admissible against Fincham. The context in which the ruling was made, however, was created by the general conduct of Kelly's defense. As the trial was unfolding, it became increasingly apparent that despite admonitions from the Court, Mr. West would not abide by the letter and the spirit of this Court's ground rules and that he believed that the defense of his client required him to be hostile in tone, as well as in substance, towards Fincham. Seeing the storm clouds gathering, this

---

1. Appellant used the alias "Bud Kelly" and he was referred to more often as Kelly than by his given name Odom.

Court decided that a severance would have to be ordered.

Since the defendants were charged with conspiracy, they were properly joined. A joint trial of co-conspirators is preferable unless such a trial will generate conditions so prejudicial to one of the defendants as to deny him a fair trial. After the present trial began, it became obvious to the trial judge that throughout the trial he was going to be faced with a choice of either curtailing Odom's defense, which could prejudice Odom, or allowing Odom's attorney to continue his inflammatory attacks on Fincham, which would be prejudicial to Fincham.

The attack of attorney West upon the co-defendant Fincham was so unrelenting and prejudicial that Fincham could not have received a fair trial as a co-defendant and before the same jury as Odom. "The taking of an adversarial stance on the part of a co-defendant's counsel may generate trial conditions so prejudicial to the defendant under multiple attack as to deny him a fair trial." *United States v. DeVeau*, 734 F.2d 1023, 1027 (5th Cir.1984), *cert. denied sub nom. Drobny v. United States*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). Odom's attorney's tactic was to bring out any information that was detrimental and prejudicial to Fincham without regard to whether such information was relevant to the charges contained in the indictment. The trial judge made a valiant effort to conduct a joint trial of co-conspirators without undue prejudice to either, but when he found that a fair trial was impossible with the defendants being tried together, he made proper use of his discretion and severed the appellant Odom for a later trial.

■ Although the severance motion was made by Fincham and opposed by Odom, the judge had the discretion to decide which defendant should continue trial before the empaneled jury, and which defendant should wait for a subsequent trial. In *United States v. Aquiar*, 610 F.2d 1296, 1301 (5th Cir.1980), the court stated: "In

light of the principles of *Arizona v. Washington*, once a severance is found to be warranted by manifest necessity, the trial court has sound discretion over who is to be retained and who is to be severed."

Since Fincham had been severed in a prior trial arising out of the same alleged murder, it was not an abuse of discretion for the trial judge to consider the possible impact upon public opinion and public confidence in the courts that might result from a second severance of Fincham and a second delay of his trial.[2]

### III.

■ We have decided that the trial judge was within his discretion in granting a severance of the co-defendants and in deciding which of the two should be severed. We now come to the question of whether appellant Odom may be required to stand trial before a new jury, or whether such a trial is barred by the double jeopardy clause of the Fifth Amendment: "... nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." A person is protected by this language from being subjected to the hazards of a trial and the possibility of conviction more than once for the same alleged offense. It is twice being placed in jeopardy that triggers the protection and not being twice convicted or twice punished. However, not every second trial is prohibited.

The Supreme Court has not addressed the Double Jeopardy Clause as it relates to the retrial of a defendant who has been severed after jeopardy attached in a prior trial. However, the Court has provided substantial guidance to us in *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), which involved a claim to double jeopardy protection after the granting of a mistrial at the request of the state because of prejudicial statements made by the defendant's attorney in his opening statement.

---

**2.** The Court offers no opinion as to whether it might have been an abuse of discretion to proceed with Fincham's trial had he not been severed previously, as those were not the circumstances of the case now before us.

Washington was tried and convicted of murder but his conviction was reversed on appeal and he went to trial a second time. After the jury was sworn and Washington was placed in jeopardy, his attorney made an opening statement in which he stated that prosecutorial misconduct during the first trial had necessitated a second trial. The prosecutor objected and requested a mistrial claiming that such was a "manifest necessity" to protect the public interest in a fair trial. The trial judge, after considering curative instructions to the jury and other alternative solutions, concluded that none would be adequate and he granted the prosecution's motion for a mistrial. Washington then claimed that another trial was barred by the Double Jeopardy Clause, but the Supreme Court did not agree and stated:

> Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused. Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

*Id.* at 505, 98 S.Ct. at 830.

The court found that other decisions had used "evident necessity" and "imperious necessity" but that these phrases have the same meaning as "manifest necessity," and refer to a "high degree" of necessity. It concluded that this level of necessity was difficult to define and for this reason the trial judge's decision is accorded great deference. However, the reviewing court should satisfy itself that "the trial judge exercised 'sound discretion' in declaring a mistrial." *Id.* at 514, 98 S.Ct. at 835.

We are persuaded that, along with the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny, the difficulty which led to the mistrial in this case also falls in an area where the trial judge's determination is entitled to special respect.

In this case the trial judge ordered a mistrial because the defendant's lawyer made improper and prejudicial remarks during his opening statement to the jury. Although respondent insists that evidence of prosecutorial misconduct was admissible as a matter of Arizona law, and therefore that the opening statement was proper, we regard this issue as foreclosed by respondent's failure to proffer any Arizona precedent supportive of his contention and by the state court's interpretation of its own law, buttressed by the consistent opinion of the Federal District Court and the Court of Appeals. Cf. *Bishop v. Wood,* 426 U.S. 341, 346–347 [96 S.Ct. 2074, 2078–79, 48 L.Ed.2d 684 (1976)]. We therefore start from the premise that defense counsel's comment was improper and may have affected the impartiality of the jury.

We recognize that the extent of the possible bias cannot be measured, and that the District Court was quite correct in believing that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, a mistrial is not "necessary." Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment.

\*     \*     \*     \*     \*     \*

An improper opening statement unquestionably tends to frustrate the public in-

terest in having a just judgment reached by an impartial tribunal. Indeed, such statements create a risk, often not present in the individual juror bias situation, that the entire panel may be tainted. The trial judge, of course, may instruct the jury to disregard the improper comment. In extreme cases he may discipline counsel, or even remove him from the trial as he did in *United States v. Dinitz*, 424 U.S. 600 [96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)]. Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument. Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases. The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred. The adoption of a stringent standard of appellate review in this area, therefore, would seriously impede the trial judge in the proper performance of his "duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop ... professional misconduct."

*Id.* at 510–13, 98 S.Ct. at 833–34.

We recognize that the conduct of Odom's attorney did not amount to misconduct, as did that of Washington's attorney, and we do not label it as misconduct. However, it was designed to prejudice the codefendant Fincham by use of evidence, statements, and innuendos about his past illegal acts which might not be relevant to the present charge. The trial judge was familiar with the first indictment and trial, and he attempted to try co-defendants who had been properly joined, but in spite of his efforts he found that a fair trial for Fincham would be denied so long as he was in a joint trial with Odom. His finding is entitled to the "special respect," and we find that the trial judge exercised the "sound discretion" required by *Arizona v. Washington* in concluding that the circumstances presented a situation of "manifest necessity" requiring a severance to insure a fair trial.

A defendant's right to have his trial completed before a particular jury is not absolute. As pointed out by Justice Black in *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949): "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."

The dissent's analysis is unpersuasive because it reasons that the personal nature of the double jeopardy bar requires application of the manifest necessity test to gauge the trial court's choice of which defendant among several or many to sever, *given that* there was plainly a manifest necessity to sever in the first place. Thus, the dissent advocates a two-tiered test, in which manifest necessity must be found to exist at both steps of the severance process. Applying the manifest necessity test in this fashion is inappropriate in light of that test's origin in the historical context of single-defendant trials. *See* discussion in *Arizona v. Washington*, 434 U.S. at 506–10 & nn. 18–27, 98 S.Ct. at 830–32 & nn. 18–27. In this historical context, the development of an individually focused test to fit the mistrial situation is both understandable and entirely appropriate. But, in the context of joint trials (which, given the current reality of federal criminal law, are more often mass trials), the appropriate place for application of the manifest necessity test is the trial judge's initial decision to stop the trial as it is then proceeding. The choice of whom to sever is a question of discretion, to be reviewed only for abuse, not by a second application of the extremely stringent manifest necessity test.

In this way, the interest of society in achieving fair and just trials for all, *see Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837, will not be defeated by the mechanical application of a test rooted in historical antecedents insufficiently related to present realities to justify it in this context.

We conclude that the severance met the standard of manifest necessity and there was no abuse of discretion in proceeding with the trial of Fincham. Appellant Odom's protection against double jeopardy will not be violated by requiring him to go to trial on the present superseding indictment. The necessity for the severance was, after all, created by the defensive tactics employed by appellant and his attorney.

### IV.

We find no merit to appellant's claim that the government be denied the use of any evidence that may be developed after the date of the trial from which appellant was severed.

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

Because I believe the majority misconstrues both the factual background of this case and applicable constitutional law, I must respectfully dissent.

A terrible crime occurred in Maryland when a witness for the government in a federal criminal case was murdered. The government established to its own satisfaction sufficient grounds for seeking and obtaining indictment of two individuals, Cecil Odom, a/k/a Bud Kelly, and Victor Fincham, for the crime. The cases seemed eminently ones for joinder, a conspiracy being charged and the two cases obviously having an overlap of factual material.[1]

However, after the case had gone to trial, with a jury impaneled and substantial testimony taken, certain aspects of the case as it developed became disturbing to the trial judge. The grounds for disturbance were not trivial. Odom's defense turned in a large degree into an attempt to show that the responsibility for the killing lay on Fincham's shoulders and not his own. Fincham, on the other hand, took the position that he was not to blame. The prominence accorded during the trial to those conflicting versions concerned the court over whether a fair trial could be insured to Odom and Fincham if tried together. Fincham heightened the problem by seeking a severance of his case,[2] while Odom strenuously objected to a severance.

Deciding that severance was the best course to pursue, the district court heard argument as to which defendant was to be severed. That would determine whose trial would proceed and whose would be deferred to a later date. For once unanimous, the defendants both urged that Fincham be severed, with the trial proceeding as to Odom. It appears that the federal government, although it is clear that it felt that it had a viable case against either Odom or Fincham,[3] preferred to continue against Fincham and defer as to Odom since Fincham had already earlier secured a mistrial in a prior case involving charges of murder of the same federal witness, and the government was concerned about the effect on the public created if Fincham, a second time, should escape, for the time being at least, the hoped for consequences envisaged by the federal government.

The district judge, apprised of the government's preference and the reasons underlying it, was influenced by what appeared to be justifiable concerns so he severed out Odom despite his objections, based on the aforementioned potential bad publicity if Fincham's trial were postponed. The trial against Fincham then proceeded. That ended in Fincham's conviction. Odom

---

1. F.R.Crim.P. 8(b) states:

   Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

2. F.R.Crim.P. 14 provides:

   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

3. Otherwise why were the two cases brought to trial in the first place?

now attempts to raise a double jeopardy bar to his retrial.

The legal question presented here is really quite simple. The jury had been sworn and jeopardy had attached to Odom. As the Supreme Court made clear in *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), premature termination of an objecting defendant's trial bars subsequent retrial unless the government can demonstrate that the defendant's trial was terminated due to manifest necessity. The question presented is thus simply whether manifest necessity existed to deprive Odom of his "valued right to have his trial completed by a particular tribunal." *Arizona*, 434 U.S. at 505, 98 S.Ct. at 830.

It does not seem open to serious question whether some severance should have been granted.[4] We may accept that it was manifestly necessary for a severance to occur if fair trials were to be assured. That, of course, necessitated separate trials for Fincham and Odom, a continuation before the same jury for one, and retrial for the other.

Manifest necessity to abort one part or aspect of the trial, Fincham's or Odom's, by severance undoubtedly existed, but estab-

lishment of that fact does not answer the question of whose trial, between them, should be aborted. It was not "necessary to discharge a jury before a trial is concluded." *Arizona v. Washington*, 434 U.S. at 505, 98 S.Ct. at 830.[5] Severance would inevitably lead to mistrial and the consequent placing of the one severed on his trial before a second jury. The trial against the other could and would proceed. Mistrial, however, would constitute *double* jeopardy in Odom's case[6] but it would not do so in Fincham's. Odom, in opposing severance, had insisted that his trial continue without interruption but Fincham, unlike Odom, had requested severance, and consequently a mistrial. By that act, Fincham consented to being retried. Because of Fincham's request, his retrial would not amount to double jeopardy. *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087–88, 72 L.Ed.2d 416 (1982). Odom's would. With Fincham's severance, there would no longer be any manifest necessity to sever Odom. Fincham's retrial would not run up against the Double Jeopardy Clause. Odom's definitely would.

The trial judge found that no significant prejudice had occurred to either defendant thus far,[7] and specifically found that he

---

**4.** While requests for a severance under Rule 14 "must be raised prior to trial," F.R.Crim.P. 12(b), Fincham had requested, but been refused, severance pre-trial and in any event the rule concerns a party's request for severance, not the district court's act to insure a fair trial.

**5.** The jury in fact remained in full operation. It carried on the trial of Fincham, ultimately convicting him.

**6.** Creating a "manifest necessity" not to interrupt his trial.

**7.** Prejudice is by no means absent from this record, however. Indeed, the prejudice to Fincham caused by Odom's defense, while perhaps minimal, is undoubtedly an alternative, albeit unstated, reason for the government's preference for proceeding against him rather than Odom. The *double jeopardy prohibition* was designed to prevent the possibility of such governmental overreaching for the purposes of securing a tactical advantage. Jeopardy specifically attaches *before* a judgment becomes final, embracing the defendant's "valued right to have his trial completed by a particular tribunal," *Arizona*, 434 U.S. at 503, 98 S.Ct. at 829, because

[e]ven if the first trial is not completed a second prosecution may be grossly unfair. It imposes the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

*Id.*

The district judge chose to accept the government's recommendation because he felt the dilemma was analogous to the initial prosecutorial decision made before jeopardy had attached. The analogy is inapposite. Here, the government is presented with two trials which have progressed to the midway point; it will obviously choose to proceed with the case that is tactically more sound, which it did. Whatever validity the allegations of policy as to trying Fincham first had, a review of the record reveals there is no question that he was "softened up" by Odom's counsel's vigorous defense. Tactical ad-

could see no legal reason to favor one over the other.[8] Odom, who had fought severance throughout the trial, wished to be retained. Fincham, who had sought severance throughout the trial, wished to be the one severed. Ignoring their requests, the trial judge sought the government's recommendation, which unsurprisingly was the exact opposite of the individual defendants'. Asserting potential bad publicity stemming from the severance of Fincham in a second straight trial, the government pressed for his retention. The court acceded to the government request and severed Odom.

Once that contention is unraveled, it stands revealed as an assertion not merely that *either* Odom or Fincham could be selected for continuation of his trial (*i.e.*, discontinuance for the other) at the government's choice, but, indeed, as a statement that *both* Odom and Fincham could be forced to abort a trial already well underway as to which jeopardy had attached, and be required to start anew. The majority attempts a gymnastic feat in suggesting that, if this case had involved trial of a single defendant in Odom's circumstances, his double jeopardy claim would be well taken,[9] but because the severance question had to be decided first and involved a choice of whom to sever, a mistrial for either Odom or Fincham, the court was free to exercise its discretion as to whom it would sever and whom continue. That ignores the fact that Fincham had sought severance and for himself, therefore, of necessity, retrial, while Odom had vigorously insisted on his case continuing. It was not, I submit, an alternative open to the trial court to exercise its discretion as to which of the two defendants to sever (granting a mistrial) and whose case to continue on when one of the defendants asserting the double jeopardy provisions of the Constitution insisted on going forward *and* the other defendant was prepared to accept severance and mistrial. There simply was not a manifest necessity to sever *and to choose Odom for severance*, thereby declaring a mistrial in Odom's case. The Double Jeopardy Clause will have little meaning in multiple trials if the district court has the discretion simply to pick and choose and, in the course of doing so, ignore one defendant's insistence on being tried when there was a course open for the trial to continue on.

The problem with which we are faced, indeed, arises because Odom strongly protested against any severance which would result in the discontinuance of the case in progress against him, while Fincham sought just the opposite. Odom insisted on that trial's continuing against him alone. While a severance was manifestly necessary as long as there were the two defen-

---

8. The trial court ruled that it was not Odom's "finger pointing" at Fincham that caused him to sever the case:

> It's not that which is causing me to reach this decision in this case. It's simply the accumulating problems I see in terms of evidentiary rulings and everything else which I think discretion is the better part of valor at this point, and seeing the problems down the road, it's sort of like when you go out to sea in a sailboat, the tide gets so high and waves get so high, no matter how much you want to get to the next port, you just go back a little more conservative. I think that's the conclusion I have reached.
>
> Now why am I going forward with Mr. Fincham? I think we can go forward against

vantage is not manifest necessity. As the Supreme Court stated in *Arizona*, "the strictest scrutiny is appropriate when ... there is reason to believe that the prosecution is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Arizona* at 508, 98 S.Ct. at 832.

either of these defendants as far as I am concerned at this point. That would be my concern, specific concern. If I thought somebody had been unfairly prejudiced, I would say that that was the one who would have to be retried at a later date. I don't think that exist [sic] in this case.

> As far as I am concerned, the matter of who to prosecute at what time generally properly lies within the discretion of the Executive Branch, and since I see no reason not to be guided by what they desire in this case, I am going to exercise my discretion to have the case proceed against Mr. Fincham. Thank you.

9. Because there were multiple defendants (here two), the district court may promote the manifest necessity to sever to cover the *lack* of necessity to place Odom in double jeopardy. That, I suggest, avoids too lightly the clear constitutional prohibition of double jeopardy.

dants, discontinuing the portion constituting the already commenced trial of Odom was not manifestly necessary, if Fincham's trial were severed. The reason mandating a severance—the mutually antagonistic defenses of Fincham and Odom—did not mandate a preference over which defendant was to be severed. In other words, it may have been manifestly necessary to sever; it was not manifestly necessary to sever Odom.[10]

The majority's argument, in essence, is that "once a severance is found to be warranted by manifest necessity, the trial court has sound discretion over who is to be retained and who is to be severed." *United States v. Aquiar*, 610 F.2d 1296, 1301 (5th Cir.), *cert. denied*, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980). In the majority's view, given manifest necessity to sever, the trial judge did not abuse his discretion to defer Odom's trial, and that for the majority is the end of the matter.[11]

The majority's rationale, however, is patently incorrect. A mere recital that a matter is within the discretion of the trial court does not immunize it from constitutional concerns. In this instance, manifest necessity may have existed to sever the trials, but that is not the critical stage for the present double jeopardy examination. The analysis must focus on Odom, the severed defendant—it is his rights that are being tested, his constitutional safeguards that must be weighed against the public interest in a complete prosecution. Thus, the inquiry must be whether, after severance was mandated, manifest necessity dictated that Odom be denied the right to have his trial completed before the original jury sworn.

If trial had proceeded against Odom, manifestly no prejudice would have attached to either defendant; one wished to be severed, one wished to be retained. In Fincham's case, discontinuance by severance as to him and subsequent retrial would not create the constitutional problem which confronts us in Odom's case as things have developed, for Fincham—not Odom—initiated the request for a severance. The request amounted to a motion for a mistrial as to Fincham and ended any basis, on double jeopardy grounds, for asserting that he could not be retried. *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087–88, 72 L.Ed.2d 416 (1982). Fincham and Odom, while disagreeing as to the need for a severance, were as one that, if there were to be a severance, the case should proceed against Odom. Odom was the one who had not sought severance, and the essence of the double jeopardy clause is that one, once put upon his or her trial, is entitled to continuation to conclusion by a finding of guilty or a finding of acquittal. Only if a retrial is necessary to avoid injustice to the one being tried may a trial be aborted and a subsequent retrial occur.[12] If Fincham were severed, trial could proceed without the threat of injustice which prompted severance in the first place. Retrial is only allowed in such circumstances

> where the mistrial was caused by an occurrence of an error which could not be cured during the remainder of the trial, and which could necessitate a reversal on appeal. Retrial is barred, however, where reasonable alternatives to mistrial are feasible and could cure the problem.

**10.** "In determining whether the trial judge exercised sound discretion in declaring a mistrial, we must consider whether there were less drastic alternatives to ending the trial. If less drastic alternatives were available, they should have been employed." *United States v. Sartori*, 730 F.2d 973, 975–76 (4th Cir.1984). Many courts require that "[c]urative measures be resorted to before manifest necessity can be found." *State v. Frazier*, 79 Md.App. 118, 130, 555 A.2d 1078, 1084 (1989).

**11.** The government cites to *United States v. Rich*, 589 F.2d 1025 (10th Cir.1978), for the

proposition that the trial judge's discretion is unaffected by whether the defendant seeks or acquiesces in the termination of the first trial. *Rich*, however, is inapposite. In *Rich* a jury in a pending trial was discharged over the objection of the defendant Rich. In the absence of manifest necessity, the court found Rich's retrial barred by double jeopardy.

**12.** Of course, if, as in Fincham's case, the criminal defendant has requested a mistrial, double jeopardy does not arise.

*State v. Frazier,* 79 Md.App. 118, 130–31, 555 A.2d 1078, 1084 (1989).

In the situation which we confront, there was, as indicated above, a paramount necessity for discontinuing the joint trial of Fincham and Odom. However, what had to be done upon a finding of manifest necessity to sever was not merely the granting of a mistrial to be followed by grant of a new trial to *either* party. Rather, it was a question of which party could be severed without triggering the law of double jeopardy. Here, Fincham could not argue double jeopardy upon retrial. However, Odom most emphatically could do, and has done, so.

I in no fashion wish to denigrate the discretion of the trial judge. Absent constitutional imperative, his reasoning would certainly withstand our review.[13] Yet constitutional concerns must remain paramount. Indeed, the resulting impingement on the trial court's overall control of the severance process is minor. If both Odom and Fincham had sought mistrial, no problem under the double jeopardy clause would have been occasioned, whichever defendant's extant trial had continued on and whichever defendant's extant trial was deferred. If neither Odom nor Fincham had sought a severance, with each insisting that his case continue, the present problem would also obviously not be before us. One "defendant's valued right to have his trial completed by a particular tribunal [would have] to be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

In this particular instance, however, the court's choice was mandated. There was no manifest need, only policy, perceived by it as good, underlying the decision to proceed against Fincham rather than Odom. Policy concerns do not trump constitutional rights. Fincham waived his rights by requesting severance. Absent any factor completely barring Fincham's retrial if severed, Odom's request to be retained must be honored. "If a defendant chooses to stick it out to the sweet or bitter end, that is his choice. If the defendant desires a mistrial, he must manifest that desire by asking for it." *Crutchfield v. State,* 79 Md.App. 101, 108, 555 A.2d 1070, 1073 (1989). As Fincham sought mistrial while Odom adamantly insisted on proceeding with a trial, choosing in effect "to stick it out to the sweet or bitter end," where he had obviously already been placed in jeopardy, the district court was required to accord to Odom his constitutional prerogative. In that posture, there was a manner of proceeding which could achieve both objectives, with no intrusion on constitutional rights, severance for Fincham who requested it, and proceeding on with the trial of Odom which had already commenced and which he adamantly insisted should proceed.

As stated, justification for the action of the district judge is asserted on the basis of *United States v. Aquiar,* 610 F.2d 1296 (5th Cir.1980), which mandates that deference should be given to the action of the district judge in choosing whom to continue to try and whom to sever unless, of course, either defendant's rights would be infringed. However, severance, while not actively sought, was not objected to in *Aquiar* and in that state of things, apparently, the court perceived no such infringement. The lack of objection seemed to equate to acquiescence. *Id.* at 1301.[14]

---

**13.** Opting for the government's preference (hardly a constitutional imperative), the judge, however, disregarded the *constitutional* protection, so far as Odom was concerned, against double jeopardy.

**14.** *Aquiar* is distinguishable also since the person there asserting double jeopardy because of a severance to which she did not object was the tail wagging the dog as one of seven defendants, some arguably more culpable than she, the trying of six of whom would have to start entirely anew if her contention prevailed. Also, it was her intention to have her counsel criticize one defendant for exercising his constitutional right to remain silent, in contrast to her election to testify. Her failure to object to severance takes on added significance in light of those conditions.

Furthermore, the government in relying on *Aquiar* has sought to justify the choice of Odom to be severed, rather than Fincham, because Odom's counsel kept accentuating aspects of the

The critical consideration throughout, however, is that Odom did not acquiesce in severance while Fincham sought it. Indeed, Odom adamantly opposed it. He asked that the trial continue as to him. He now asserts that, for double jeopardy reasons, he no longer may be put to his trial a second time without there being a manifest violation of his constitutional rights. Although it is not a congenial task to foreclose the government's prosecution of a case where it at least thought it had a strong chance of securing a conviction, nevertheless, such considerations cannot rise to the same high level as, and contradict, the United States Constitution which provides in Amendment 5: "... nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb...."[15] The federal government cannot prosecute Odom, against his will, for the crime or crimes for which he had been indicted and for which he had been put to his trial up to the point in this case of severance. The manifest necessity not to continue his trial ended with the severance. By choosing to sever Odom and proceed with Fincham, the only mistrial granted in the case was of the defendant affected, Odom. It was by him repeatedly, even vehemently opposed.[16] The point is effectively and cogently summed up in *Crutchfield*:

> In summary, this case is one in which the trial judge, upon concluding that damaging statements which had been admitted into evidence should have been excluded, took it upon himself to declare a mistrial *sua sponte* in order to protect the rights of a defendant who did not seek or consent to that protection. There being nothing in the record indicating a *manifest*, i.e., palpable, evident, obvious, clear, plain, or patent, necessity for the trial judge to have aborted the

case which gave rise to the justifiable fear of prejudice to Fincham were the joint trial to proceed. But Odom's counsel had a duty to protect Odom's interests. The district judge before granting the severance observed in questions to the prosecution:

> Why doesn't Mr. West's (Odom's counsel) argument have some force? Why isn't that evidence from which one could reasonably argue that the phone call did not have the effect subscribed to it by at least the government? ... Why isn't what Mr. West is saying not right? Why isn't that legitimate argument for him to make?

The district judge also found that nothing in West's opening argument "was unfairly prejudicial as far as I am concerned in terms of the whole context of this case."

Even after severance of Odom had occurred and he was pressing a double jeopardy objection against his retrial, while the district court did allude to West's hostile tone of attack "with a personal venom" against Fincham, he expressed no disagreement with West's right to introduce the provocative evidence.

There is a vast difference between actual "misconduct" and an aggressive defense, particularly when the choice of label carries constitutional significance. Energetic presentation of a client's case is hardly a proper basis for extinguishing the client's constitutional right to be free from double jeopardy.

**15.** There are today some pundits not averse to judicial utterances decrying any adding to the language of the founding fathers. They favor taking the Constitution as it is written with no insertions or emendations. But such a strict construction is urged by no one here. Everyone agrees that after "nor shall any person" in the amendment to the Constitution the phrase "except in a case of manifest necessity" should be inferred. I know of no authority, however, for expanding the inferred term to read: "except in a case of manifest necessity *or the convenience of the prosecutor for the government.*"

**16.** It is vitally important to bear in mind that mistrial, for the purposes of the present double jeopardy analysis, was limited to Odom's case. To reiterate, the manifest necessity that he and Fincham not be tried together mandated severance but severance of Fincham was sufficient. It was error to sever Odom, who objected to severance vociferously. There would be no manifest necessity in the case any longer, unless one recognizes manifest necessity to proceed with Odom's trial, once Fincham, who sought severance, was granted it.

The language in *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978), is most instructive:

> Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

*Cf. United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

Again, while the severance was manifestly necessary, the mistrial in the case of Odom was not.

trial, a retrial of appellant is barred by the Double Jeopardy Clause of the Fifth Amendment, which is made applicable to proceedings in State courts by the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). It was error to deny appellant's motion to dismiss the indictment.

*Id.* 555 A.2d at 1074 (emphasis in original).[17]

Accordingly, I would reverse and remand with instructions that the indictment of Odom be dismissed on double jeopardy grounds.[18]

---

**17.** Though the opinions in *Crutchfield* and *Frazier* were handed down in early April 1989, over a month prior to argument in the case which concerns us, they were not briefed or argued. The fact that they are state court decisions on a federal constitutional law point should not render them inapplicable.

In *Etheridge* [*v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525 (1989) ], the Supreme Court of Virginia discussed the validity of the cap under the Federal Constitution and rejected some of the same challenges raised here. While *Etheridge* is of course not binding upon us in these matters of federal law, we find its reasoning persuasive and we follow it in this case, adding only some additional comments.

*Boyd v. Bulala,* 877 F.2d 1191, 1195–96 (4th Cir.1989).

**18.** The consequences may not be as unfortunate as the government asserts, as Odom may still be liable under state law for any crimes committed. *See United States v. Wheeler,* 435 U.S. 313, 316–17, 98 S.Ct. 1079, 1082–83, 55 L.Ed.2d 303 (1978).

It is all, in the end, too reminiscent of that childhood game of how to ferry three missionaries and three cannibals across a river in a boat holding only two passengers in such a way that cannibals are never in a majority. It all comes down to this. Imagine two individuals out for a walking trip together. The journey leads them through a pass in the mountains, part of which consists of a narrow gorge barely negotiable for two traveling side by side. A mountain slide, however, has brought down a large mass of rock and other debris, making it impossible for more than one to pass at the same time. Passing in Indian file would cause to arise the risk that a boulder dislodged by one might strike and cause the other to fall. Only proceeding alone or side by side would be safe. One of the hikers (Fincham) does not want to press on but prefers to wait at a nearby inn 'til next morning to continue the journey. The other (Odom) faces extreme time constraints requiring his presence at the destination as soon as possible and feels it necessary, manifestly necessary if you will, to carry on. There is, however, absolutely no manifest necessity to detain the traveler (Odom) feeling time's exigencies and, even if the companion (Fincham) was exhausted and found it manifestly necessary to stop, the man in a hurry should be, and no doubt would be, the one to carry on through the debris choked gorge while his erstwhile companion is permitted to enjoy the good night's rest at the inn which he prefers.